NOT DESIGNATED FOR PUBLICATION

No. 121,537

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.P., A Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD KUCKELMAN, judge. Opinion filed January 31, 2020. Affirmed.

*Charles Joseph Osborn*, of Osborn Law Office, LLC, of Leavenworth, for appellant natural father.

*Meredith D. Mazza*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM:   X.P. appeals the Leavenworth County District Court's order terminating his right to parent his daughter A.P. The evidence showed that X.P. had been incarcerated for most of A.P.'s life and would, at the time of the termination hearing, remain in prison for at least 11 months. Those circumstances, as we explain, sufficiently support the district court's ruling. We, therefore, affirm. But we question whether the evidence justifies the other grounds the district court relied on, since they largely depend upon the adequacy of the assigned social service agency's efforts to assist X.P.—efforts that could be characterized as perfunctory at best.

The record from the termination hearing is sketchy in many particulars. The lack of detail does not, however, detract from the conclusions we reach. A.P. was born in January 2016. We gather X.P. and T.V., A.P.'s mother, lived together then. Both were

1

using methamphetamine, and T.V. may have had additional mental health issues. X.P. testified that he and T.V. broke up in the late summer of 2016, probably in August, and he moved out. X.P. was arrested on felony drug charges in October 2016. He pleaded guilty to possession of methamphetamine with intent to distribute, and he was sent to prison. At the termination hearing in January 2019, X.P. testified his earliest possible release from prison would be in November 2019. The record on appeal does not show X.P.'s present custodial status, and we cannot take that into account.

We gather that A.P.'s maternal grandmother actually provided much of the child's care leading up to the State's intervention. The evidence suggests T.V. was vagrant, showing up only intermittently at grandmother's home. In late November 2016, T.V. arrived delusional and likely under the influence of drugs and intended to leave with A.P. Grandmother called the local police; the responding officers took A.P. into protective custody. The State immediately initiated this child in need of care case.

The district court adjudicated A.P. to be in need of care. The Department for Children and Families placed A.P. with her maternal great grandmother, where she remained through the termination hearing. KVC was the social service agency designated to develop a plan for and to coordinate efforts aimed at family rehabilitation.

At the termination hearing, X.P. testified that he had had no contact with A.P. since his arrest in October 2016. He said he spoke on some regular basis with T.V. and grandmother about A.P., although neither of them had physical custody of A.P. He said he sent cards to A.P. for her birthday and at other times. But he did not corroborate those efforts. X.P. testified that he had no communication from KVC about family rehabilitation and never received a reintegration plan from the agency. X.P. testified that during his incarceration he has been moved among several prisons within the Kansas correctional system. The State apparently deducted child support for A.P. from wages X.P. earned in prison.

2

As its case in chief at the termination hearing, the State called three employees from KVC involved in A.P.'s placement. They testified that KVC sent several letters to X.P. in prison inviting him to participate in the rehabilitation process. None of them could confirm that X.P. received the letters. Although KVC developed a reintegration plan that included tasks for X.P., the plan was never sent or otherwise communicated to him. The record suggests KVC made no effort to contact X.P. apart from the letters.

T.V. did not personally appear at the termination hearing, and her lawyer did not actively participate in the proceeding. The record indicates the State presented proffered evidence for the termination of T.V.'s parental rights at a separate hearing in December 2018.

The district court issued an order in March 2019 terminating the parental rights of both X.P. and T.V. As we discuss, the order lists various statutory grounds the district court determined rendered X.P. and T.V. unfit, although the order does not make separate findings of unfitness to each, so we assume all of the reasons apply to both parents. The district court determined the unfitness was unlikely to change in the foreseeable future and that A.P.'s best interests favored termination. X.P. has appealed the termination order. T.V. is not a party to this appeal.

On appeal, X.P. challenges the sufficiency of the evidence supporting the district court's findings that he was unfit and, largely by implication, that any unfitness would be unlikely to change in the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a) (statutory bases for unfitness). He does not directly or by implication dispute the district court's determination that A.P.'s best interests favored termination. We begin with an outline of the core legal principles governing termination proceedings under the Revised Kansas Code for Care of Children, K.S.A. 2019 Supp. 38-2201 et seq.

A parent has a constitutionally recognized right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). The right is a constitutionally protected liberty interest. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest); *Pierce v. Society of the Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). Accordingly, the State may extinguish the legal bond between a parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2019 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

After a child has been adjudicated in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a). In considering a parent's unfitness, the district court may apply the factors outlined in K.S.A. 2019 Supp. 38-2269(b) and, when the child has been removed from the home, the additional factors in K.S.A. 2019 Supp. 38-2269(c). The district court may also turn to any of the 13 statutory presumptions in K.S.A. 2019 Supp. 38-2271 to prove unfitness. In this case, the district court drew from each of those sources to find X.P. unfit. The district court may consider nonstatutory grounds demonstrating parental unfitness. See K.S.A. 2019 Supp. 38-2269(b) (district court "not limited to" listed factors in considering unfitness). That did not happen here. A single factor may be sufficient to establish unfitness. See K.S.A. 2019 Supp. 38-2269(f).

In gauging the likelihood of change in the foreseeable future under K.S.A. 2019 Supp. 38-2269(a), the courts should use "child time" as the measure. As the Code recognizes, children experience the passage of time in a way that makes a month or a

4

year seem considerably longer than it would for an adult, and that difference in perception typically tilts toward a prompt, permanent disposition. K.S.A. 2019 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

When the sufficiency of the evidence supporting a decision to terminate parental rights is challenged, an appellate court will uphold the decision if, after reviewing the record evidence in a light most favorable to the State as the prevailing party, the district court's findings on unfitness and foreseeability of change are supported by clear and convincing evidence. Stated another way, the appellate court must be persuaded that a rational fact-finder could have found it highly probable that the circumstances warrant the termination of parental rights. *In re B.D.-Y.*, 286 Kan. at 705. In evaluating the record, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

Although the district court's best interests determination is not at issue on appeal, we mention the governing standard as a matter of completeness, since it differs from the measure for unfitness. As directed by K.S.A. 2019 Supp. 38-2269(g)(1), the district court should give "primary consideration to the physical, mental[,] and emotional health of the child" in making a best interests finding. A district court decides best interests based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. The decision essentially rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1116. An appellate court reviews those sorts of conclusions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See

5

*Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

In its order, the district court identified these statutory bases for finding X.P. to be unfit:

• X.P. was convicted and imprisoned on felony charges, as provided in K.S.A. 2019 Supp. 38-2269(b)(5);

• A failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family, as provided in K.S.A. 2019 Supp. 38-2269(b)(7);

• X.P.'s lack of effort to adjust his circumstances, conduct, or condition to meet A.P.'s needs, as provided in K.S.A. 2019 Supp. 38-2269(b)(8);

• X.P.'s failure to maintain regular visitation, contact, or communication with A.P or her legal custodian when she was not in his physical custody, K.S.A. 2019 Supp. 38-2269(c)(2);

• A failure of a reasonable plan approved by the court directed toward reintegration of A.P. into the parental home while A.P. was not in X.P.'s physical custody, as provided in K.S.A. 2019 Supp. 38-2269(c)(3);

• A presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a)(5) because A.P. had been out of the home for more than a year and X.P. substantially neglected or willfully refused to carry out a reasonable family reintegration plan; and

• A presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a)(6) because (1) A.P. had been placed out of the home for more than two years; (2) X.P. failed to carry out a reasonable plan of reintegration; and (3) there was a substantial probability he would not carry out the plan in the near future.

We look first at X.P.'s unfitness because of the felony drug conviction and his resulting imprisonment. This court outlined various considerations in the termination of rights based on a parent's conviction and imprisonment in *In re K.O.*, No. 116,704, 2017

6

WL 2403304, at *4 (Kan. App. 2017) (unpublished opinion). We borrow here accordingly:

"This court has consistently recognized that incarceration typically does not delay or excuse completion of a reasonable reintegration plan. See *In re M.H.*, 50 Kan. App. 2d 1162, 1172, 337 P.3d 711 (2014); *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009); *In re M.D.S.*, 16 Kan. App. 2d 505, 509-10, 825 P.2d 1155 (1992). Nor does it necessarily stave off termination of parental rights. To the contrary, imprisonment for a felony is a specific statutory ground that may warrant a finding of unfitness. See K.S.A. 2016 Supp. 38-2269(b)(5). This court, however, has pointed out that, depending on the circumstances, imprisonment might not mandate termination. *In re M.H.*, 50 Kan. App. 2d at 1172; *In re M.D.S.*, 16 Kan. App. 2d at 510. For example, if the parent already had a well-established relationship with an older child, a district court properly could find that a comparatively short period of incarceration could mitigate noncompliance with some aspects of a reintegration plan or otherwise weigh against termination. See *In re M.H.*, 50 Kan. App. 2d at 1172. In that circumstance, the condition of unfitness—the parent's incarceration—reasonably could be viewed as likely to change in the foreseeable future."

Not to put too fine a point on it, a person in prison typically cannot provide the physical supports associated with parenting a child, such as suitable housing, food, and clothing. Moreover, the parent is in no position to offer any sort of continuing moral or emotional direction for the child, let alone daily or otherwise routine positive interactions. Here, for example, X.P. had no visits or other direct contact with A.P. from his arrest through the termination hearing. The evidence does not really show he had much in the way of meaningful interaction with A.P. even before then. At the time of the termination hearing, A.P. had just turned three years old, and she had no communication with X.P. for more than two years.

Even in the best scenario, X.P. would not have been released from prison for another 11 months. And he would not have been ready to immediately assume physical custody of A.P. He would not have a suitable place to live or regular employment at that

point. At the termination hearing, X.P. took a fairly casual attitude toward his earlier use of illegal drugs. He characterized his methamphetamine use as an intermittent recreational diversion rather than a habit or an addiction. But he undoubtedly would have had to demonstrate an ability to remain drug free before the State would have agreed to unconditionally return A.P. to his care and custody. See *In re L.D.*, No. 119,613, 2019 WL 257979, at *4 (Kan. App. 2019) (unpublished opinion) ("The real test . . . lies in the parent's ability to avoid relapsing after treatment.").

So in January 2019, X.P. was not in a position the district court could realistically expect him to parent A.P. for well over a year. Given the lack of an established or ongoing relationship between X.P. and A.P., the district court properly found X.P. to be unfit at the time of the termination hearing. Considering A.P.'s particularly young age, child time supported the district court's conclusion that X.P.'s unfitness based on his incarceration would not likely change in the foreseeable future in a manner permitting establishment of a full parent-child relationship.

In short, the district court properly found X.P. to be unfit in a way that was unlikely to change with sufficient promptness under K.S.A. 2019 Supp. 38-2269(a). The facts here entail a recurrent situation the Legislature intended to treat as parental unfitness and, thus, illustrate why a felony conviction coupled with extended imprisonment represents a stand-alone ground warranting a finding of unfitness. X.P. has not disputed the district court's best interests determination, the other legal component necessary to terminate his parental rights. Accordingly, we find no error on this point, a conclusion that, in turn, supports the termination order. On this basis, we affirm the district court's ultimate conclusion.

We are not nearly so comfortable with the district court's other determinations of unfitness. We suppose the evidence technically supports unfitness based on X.P.'s lack of communication with A.P. or her legal custodian after the child in need of care

8

proceedings had begun, as outlined in K.S.A. 2019 Supp. 38-2269(c)(2). X.P. testified he communicated with T.V. and A.P.'s grandmother about A.P. Although his testimony was not independently corroborated during the termination hearing, neither did the State offer evidence contradicting it. But DCF had placed A.P. with her maternal great grandmother, so X.P. was not communicating with the child's custodian. The undisputed evidence shows X.P. did not contact KVC to get information about A.P. or to convey cards or other messages to her. X.P.'s incarceration obviously inhibited his ability to communicate with or about A.P. Even so, his efforts to do so come across as meager. Whether the limited communication alone would adequately undergird finding X.P. unfit may be a fairly debatable point, especially given the gravity of a termination order.

The remaining grounds the district court relied on are more problematic. The district court found that X.P. failed to take steps to adjust his circumstances to accommodate A.P. as a child in need of care. But X.P. was incarcerated months before the State initiated these proceedings. The district court doesn't really identify what X.P. could have done from prison that he didn't do, perhaps apart from the lack of communication directly with A.P. or her great grandmother. X.P. did participate in and complete a number of courses or programs aimed at self-improvement while he was in prison, including vocational training and mandatory drug education.

The rest of the specific grounds the district court cited all depended upon X.P. essentially failing to achieve required goals and benchmarks in a family reintegration plan. There is a pronounced shortcoming in that evidence: While KVC formulated a plan, the agency never conveyed that plan to X.P. We fail to see how, consistent with due process precepts, he can be severely faulted for not complying with a plan that was never given or explained to him. X.P. should have been afforded a fair opportunity to succeed or fail—an opportunity that necessarily eluded him because he was never informed of what he was expected to do. See *Wright v. Kansas State Board of Education*, 46 Kan. App. 2d 1046, 1073, 268 P.3d 1231 (2012) (Atcheson, J., concurring) (When an agency

9

"has failed to share its definition or criteria for determining . . . success . . . [it] has slyly created a game without discernible rules, and such a game can never be won.").

To be sure, X.P. may have been unable to make significant progress on the plan as an inmate. But that sort of hypothetical anticipatory failure cannot erase KVC's lack of effort in making sure X.P. received a copy of the plan and at least some guidance as to how he might work toward the identified goals notwithstanding his incarceration. The record indicates all KVC did was to send a few letters to X.P. essentially inviting him to contact the agency. He never did. Moreover, the agency cannot establish he received the letters, something we shouldn't necessarily assume given X.P.'s transfers within the prison system. By the same token, X.P. became aware of these proceedings at some point—exactly when is a matter of dispute—and did not independently contact KVC.

Given KVC's charge to actively promote family reintegration, the fault for inaction may rest more heavily on the agency in this case. KVC's perfunctory efforts to communicate with X.P. seem difficult to justify, especially since he was in state custody (and, thus, presumably readily locatable with some minimal inquiry) rather than moving freely from place to place in the outside world without informing the agency of his whereabouts. Under the circumstances, we question whether the evidence crosses the clear and convincing threshold for those statutory bases for unfitness dependent upon the agency's reasonable efforts at family rehabilitation or X.P.'s purported dereliction in failing to participate in those efforts.

Ultimately, however, whatever the shortcomings of the agency and the flaws in the district court's findings, the evidence did establish unfitness and unlikelihood of change under K.S.A. 2019 Supp. 38-2269(b)(5) based on X.P.'s continuing imprisonment. That's legally sufficient to support the district court's termination order.

Affirmed.

10